IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTINA ELDER,            )
                            )
        Plaintiff,           )
                            )
vs.                         )   Civil Action No. 07-59
                            )   Judge Joy Flowers Conti/
                            )   Magistrate Judge Amy Reynolds Hay
MICHAEL J. ASTRUE,          )
Commissioner of Social Security, )
                            )
        Defendant.           )

# REPORT AND RECOMMENDATION

## I.     RECOMMENDATION

It is respectfully recommended that the Motion for Summary Judgment filed by the plaintiff (Doc. 8) be denied. It is further recommended that the Motion for Summary Judgment filed by the defendant (Doc. 10) be granted and the decision of the Commissioner be affirmed.

## II.    REPORT

### A.    Procedural History

Plaintiff, Christina Elder, brought this action under 42 U.S.C. § 1383(c), which incorporates § 405(g), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") disallowing her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383f.

Plaintiff filed an application for benefits on April 25, 2003. (T. 50-66). In her

application, plaintiff claims a learning disability with an onset date of April 1, 2003.[1] (T. 49). Plaintiff's application was denied by the agency on August 4, 2003 (T. 35-38), and on September 23, 2003, plaintiff requested a hearing before an administrative law judge ("ALJ"). (T. 39).

A hearing was held on June 29, 2004 and testimony was taken from plaintiff, who was represented by counsel, and from a vocational expert ("VE"). (T. 154-175). On December 17, 2004, the ALJ issued a decision on plaintiff's claim, finding that she was not disabled because she could adjust to work that exists in significant numbers in the national economy. (T. 18). Plaintiff requested a review of the ALJ's decision, which was denied by the Appeals Council. (T. 4-7). The ALJ's decision, therefore, became the final decision of the Commissioner of Social Security in plaintiff's case. (T. 4). All administrative remedies having been exhausted, plaintiff brought the instant matter for judicial review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

### B. Medical History

On October 5, 2000, plaintiff had a psychological evaluation conducted by Dr. Sharon Wilson. (T. 110-113). Plaintiff divulged that she had taken special education classes in school because of a learning disability. (T. 110). She also indicated that she quit school when she was eighteen because she had difficulty getting along with the teachers and other students. (T. 110). Plaintiff also described having mood swings, and revealed that one time in the past she had tried

---

[1] Plaintiff previously received Childhood Supplemental Security Income benefits from April 18, 1996 until April 16, 1999, when plaintiff reached the age of majority. (T. 27). The alleged onset date of disability in that application was January 1, 1996. (T. 27). A Continuing Disability Review was conducted, resulting in a determination that plaintiff's disability had ceased January 2, 2001. (T. 27). Plaintiff appealed and a hearing was held on March 19, 2002. (T. 27). The ALJ's decision was rendered August 9, 2002, finding the plaintiff's disability to have ceased. (T. 27-32). Plaintiff did not appeal the decision.

to stab herself and that she has recently had suicidal ideations. (T. 111). Dr. Wilson observed no manifestations of depression, however. (T. 111). No problems with plaintiff's concentration or memory were noticed either. (T. 111). Dr. Wilson did note that plaintiff has problems with aggression, and stated that plaintiff's social judgment is "minimally acceptable of standards and acceptable behavior in our culture." (T. 112). Dr. Wilson diagnosed "low self esteem and Adjustment Disorder." (T. 112).

Plaintiff had a psychological evaluation on June 6, 2001with Frank Mrus, Ed.D. (T. 148-151). Dr. Mrus observed plaintiff as alert, attentive and responsive, with no indication of depression or anxiety. (T. 148). Plaintiff again reported quitting school because of "trouble" with teachers and other students. (T. 149). Dr. Mrus noted plaintiff's present general health to be OK, and that plaintiff had normal sleeping and eating habits. (T. 149). Plaintiff's mother revealed that plaintiff had an emergency commitment ("302") to Southwood Hospital in 1996 for running away and threatening to harm herself and her father. (T. 149). Plaintiff related that her activities included doing the dishes, washing clothes, going out with friends and playing basketball. (T. 149).

During the course of the evaluation, plaintiff completed the Wechsler Adult Intelligence Scale-III ("WAIS-III"). (T. 149). She followed instructions and could focus on the given tasks. (T. 149). Plaintiff scored a Verbal IQ of 68, a Performance IQ of 79 and a Full Scale IQ of 71. (T. 149). Dr. Mrus stated that according to both the Wechsler and DSM-IV[2] classification systems, plaintiff's Full Scale IQ is indicative of Borderline Intellectual Functioning, and characterized the results as "reasonably accurate" taking into account that plaintiff had a cold on

---

[2]*Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994).

that particular day. (T. 149). The scaled scores for plaintiff's subtests ranged from slightly to significantly below the expected level for persons within her age range (20-24). (T. 149). Dr. Mrus opined that plaintiff exhibited a familiarity with the WAIS-III, but did not know, nor find out, the impetus of that knowledge. (T. 150). He suggested that plaintiff's familiarity with the test may have slightly inflated the results. (T. 150). He also suggested the possibility that plaintiff may have mild mental retardation, but ultimately diagnosed plaintiff with Borderline Intellectual Functioning under the standards of the DSM-IV. (T. 150). Dr. Mrus recommended counseling or a job evaluation program for plaintiff. (T. 151).

As stated above, plaintiff filed an application for benefits on April 25, 2003. (T. 49-53). Plaintiff self-referred to Mercy Behavioral Health on May 22, 2003, seeking therapy for depression. (T. 115-121). Plaintiff reported experiencing mood swings, issues with anger management and being the subject of verbal abuse. (T. 121). She related the story of having tried to stab herself one time in the past, and stated that she had been on anti-depressant medications. (T. 121). Despite indicating a desire for individual therapy, plaintiff never returned to Mercy Behavioral Health after the hospital failed to contact her as promised. (T. 167-168).

Leon Kalson, Ph.D., conducted an evaluation of plaintiff on June 12, 2003. (T. 122-129). Dr. Kalson's report of plaintiff's history was consistent with the previous evaluations. (T. 122). Dr. Kalson noted that plaintiff exhibited signs of depression, frustration and repressed anger, and was defensively in denial. (T. 123). Plaintiff again took the WAIS-III, and obtained a Verbal IQ of 69, a Performance IQ of 81 and a Full Scale IQ of 73. (T. 123). These scores indicated Borderline Intellectual Functioning, according to Dr. Kalson. (T. 123). Dr. Kalson found plaintiff's results on the WAIS-III to be "valid and reliable." (T. 123). Dr. Kalson noted that

4

plaintiff was oriented to time, place and person and had adequate remote and recent memories. (T. 124). He also noted poor insight. (T. 124). Dr. Kalson diagnosed plaintiff with Borderline Intellectual Functioning and a conduct disorder that makes her "unable to cope with stresses and demands of sustained gainful employment." (T. 124). The prognosis for both diagnoses was "Chronic." (T. 124). Dr. Kalson also determined that plaintiff's abilities to carry out instructions, interact with others in a work setting and read written instructions are affected by her impairments. (T. 127-128).

A Psychiatric Review Technique form was completed by Raymond F. Dalton, Jr., Ph.D., a state agency psychologist, on July 29, 2003, based in his review of the plaintiff's records. (T. 130-147). Dr. Dalton's review concluded that plaintiff had a mental impairment and conduct disorder, but nevertheless would be able to maintain competitive work on a sustained basis despite these limitations. (T. 134, 137, 146). Dr. Dalton rated plaintiff's limitations as either not significant or moderate in all categories on the form. (T. 144-145). Plaintiff's ability to perform sustained gainful employment was predicated on her being able to carry out short, simple instructions and the fact that her social skills are "functional from a psychiatric standpoint." (T. 146). Dr. Dalton also explicitly adopted Dr. Kalson's opinion of plaintiff's abilities, memorialized on June 12, 2003 on form DD-164, suggesting that the conclusions reached by both doctors were congruent. (T. 146).

Plaintiff's application for SSI benefits was denied on August 4, 2003 by the Administration. (T. 35). On August 5, 2003, plaintiff requested treatment at Familylinks Outpatient Mental Health Services. (T. 152). The initial diagnostic assessment summary concluded that plaintiff has an adjustment disorder with mixed anxiety and depressed mood

5

which is chronic and mental retardation of unspecified severity. (T. 152). These conclusions were based on an assessment session with the plaintiff and data from plaintiff's Initial Outpatient Assessment Worksheet and Mental Status Exam Worksheet, documents which, for some reason, are not included in the record of this case. (T. 152). The clinician recommended that plaintiff continue to treat with a therapist on an outpatient basis, but plaintiff either did not return for treatment there, or only returned a couple of times. (T. 152, 165, 167).

### C.  Hearing Testimony and ALJ Decision

At the administrative hearing, plaintiff testified that she finished the eleventh grade at Langley High School, but that she did not finish high school because she was getting into trouble, and that she was supposed to be transferred but never was. (T. 157-158). Plaintiff testified that she had tried to return to Langley, but was not allowed to. (T. 158). Plaintiff also testified that while in school she had learning disabled classes in every subject. (T. 158). Plaintiff did not remember what years she attended Langley, but conceded, based on the ALJ's calculations, that it would have been around 1994 through 1997. (T. 158-159). Plaintiff testified that she had no other education, including vocational training. (T. 159). Plaintiff testified that she had worked in the deli department at Giant Eagle[3] for about three weeks at the most in 1999. (T. 159). Plaintiff's employment with Giant Eagle ended because she was unable to keep up with the fast pace and the manager "was always on [her] case." (T. 160). Plaintiff also testified that she has had no employment since that experience, but prior to working at Giant Eagle she had worked as

---

[3]Erroneously transcribed as "John Eagle" in the transcript. (T. 159, 160, 162).

a cashier at PharMor[4] and either Toys R Us or Toy Warehouse. (T. 160). As a cashier, plaintiff had a little difficulty making change. (T. 161). She stopped working at the toy store after about a month because her drawer always "came up short." (T. 161). Plaintiff only worked at PharMor for about a week during the Christmas season when she was told by the manager that the store had enough employees. (T. 162).

Plaintiff testified that she received welfare assistance and that she had a 19-month-old daughter. (T. 163). Plaintiff testified that she and her daughter live with plaintiff's grandmother and grandfather. (T. 163). Plaintiff also testified that she does not drive, she never has driven, and either her mother, her grandmother or her aunts drive her when she needs to go somewhere, and they take her to the grocery store. (T. 163-164).

Plaintiff further testified that she was on "depression medicine," identified as "Effexor" by plaintiff's counsel, that she had been taking it for three months at the time of the hearing, and plaintiff's attorney indicated that the prescribed dosage was 75 milligrams once per day. (T. 164). Plaintiff stated that she thinks the medicine helps, and that the only other drug she takes is pain medicine once in a while. (T. 164). Plaintiff testified to seeing her regular doctor, Dr. Dubrowski (phonetic), that Dr. Dubrowski prescribed the Effexor for her, and that she does not get treatment anywhere else. (T. 165). Plaintiff testified to having gone to FamilyLinks in August 2003, but that she has not been back since. (T. 165).

Plaintiff testified that her typical day consisted of waking up around 11 a.m., seeing her daughter, then going out shopping with her aunt, coming home at around 2 p.m., taking a nap and then getting up and playing with her daughter again all day until her daughter becomes tired, after

---

[4]Erroneously transcribed as "Farmore" in the transcript. (T. 160, 161, 162).

which plaintiff goes to bed at around 10 p.m. (T. 165-166). Responding to the ALJ's observation that plaintiff sleeps for thirteen hours per day, plaintiff acknowledged that she has to get up frequently throughout the night to care for her daughter. (T. 166).

Plaintiff testified that she does not feel as though she could handle any job because she did not know who would be able to watch her daughter, nor how she would get to work, and she expressed concern about her ability to keep up with the requirements of the job. (T. 166).

Plaintiff testified that she neither cooked nor cleaned, that her grandmother did those things for her, although once in a while plaintiff did do laundry, and that she spent her time taking care of her daughter with her grandmother's assistance. (T. 166).

Upon examination by her attorney, plaintiff testified that she received SSI until she was about twenty years old. (T. 167). She reiterated that Dr. Dubrowski prescribed her Effexor, and testified that Dr. Dubrowski did not recommend that plaintiff go to mental health treatment, although plaintiff further testified that she believed that she needed mental health treatment. (T. 167). Plaintiff testified that she went to FamilyLinks of her own volition "a couple of times," but stopped going because she did not get along with the person treating her there. (T. 167). After discontinuing treatment at FamilyLinks, plaintiff testified that she again contacted Mercy Behavioral Health to seek treatment but that treatment never commenced because plaintiff expected that she would be contacted by someone regarding the treatment within a week of plaintiff's assessment interview, which never happened. (T. 167-168). Plaintiff testified that she called Mercy Behavioral back, and she was told that she would be called back, but plaintiff was never called. (T. 168). Plaintiff's testimony indicated that this second attempt of getting treatment at Mercy Behavioral was around January 2004. (T. 168).

8

Plaintiff testified that the Effexor does help her, but that it only relieves her anxiety and depression "a little bit." (T. 168). Plaintiff testified that, prior to taking the Effexor, she was always "flipping out for no reason," including getting angry with her daughter, but that since being on the medication she felt happier and less depressed and moody, although she still had bad days of feeling depression and anxiety during which she was miserable, expressing her anger in an inappropriate manner, such as wanting to hit people, yelling and screaming for no reason and throwing things, and sometimes just wanting to get away from everybody and cry. (T. 168-169). During those times, plaintiff did not feel as though she had a lot of physical energy, and, although she wanted to do things, she just could not. (T. 169). Plaintiff testified that since taking Effexor she was only experiencing these "bad days" about four days a month, as compared to every day before she began taking the medicine. (T. 169-170).

Plaintiff testified that her grandmother does help her in caring for her child, that the baby's father comes to see her once in a while and that her sister and her mother help out a little bit. (T. 170-171).

Plaintiff's testimony revealed that she was still trying to get mental health treatment, but that she had some transportation issues that were apparently affecting her ability to commence treatment. (T. 171).

A vocational expert ("VE") was also called to testify and, based on her review of the records in the file for plaintiff's case, she described plaintiff's past work experience in the deli and the various cashier positions as unskilled work that required either light or medium exertion levels. (T. 171-172). The VE was then asked to answer hypothetical questions posed by the ALJ. (T. 172). In response to the first question regarding plaintiff's potential ability to work in a

9

position similar to her past work, the VE stated that such a job would not be appropriate for plaintiff because of the direct interaction with the general public required by those jobs. (T. 172). The VE offered that other jobs were available to a person such as plaintiff, requiring simple instructions, no direct interaction with the general public, no intensive supervision or changes in the work setting, and performance of simple repetitive tasks, where training is provided on the job. (T. 172). The VE cited examples of such positions, such as laundry worker, a janitor or cleaner, or a stock clerk. (T. 172-173). The VE testified that all of those positions were readily available in the national economy. (T. 172-173).

The ALJ then inquired if this same individual should avoid decision-making and competitive production rate pace would the VE's testimony change, to which the VE replied that in her examples it would not. (T. 173). The VE testified further that reading would not be a necessary prerequisite to these jobs. (T. 173). The ALJ then asked the VE that if this same person, due to mood swings or concentration problems, would need to be off task ten minutes every hour would her testimony then change, to which the VE replied that if the person were otherwise a productive employee and were on task and diligent the rest of the time, that the person would probably be able to maintain the job. (T. 173-174). The ALJ then inquired if this person were to be off task for thirty minutes every hour, would that change the VE's testimony, to which the VE replied that "no employer would be able to allow a person to work under that scenario." (T. 174). The VE then confirmed that the testimony she gave regarding the jobs conforms to the DOT description of jobs. (T. 174).

The VE was then examined by plaintiff's attorney, who asked if the person was off task for thirty minutes every hour, or was absent from work, three or four days per month, how the

person's ability to do those jobs would be affected, to which the VE replied if the person was missing work three or four days a month, and those absences were not prearranged, an employer would find that unacceptable, and the person would not be able to work in one of those jobs if that were occurring. (T. 174).

Based on this evidence and the evidence of record for plaintiff's claim, the ALJ concluded that plaintiff has the ability to adjust to work existing in significant numbers in the national economy and, therefore, is not under a disability as defined by the act. (T. 12-13). The ALJ's decision was based on the five-step sequential evaluation prescribed by 20 CFR § 416.920[5]. Initially, the ALJ noted that plaintiff had not engaged in substantial gainful activity. (T. 13). The ALJ then stated that plaintiff's intellectual functioning is below average, but the degree of impairment is unclear, and noted that the medical evidence of record indicates a diagnosis of Borderline Intellectual Functioning rather than mild mental retardation, which, taken in consideration with plaintiff's daily activities, including providing care for her child, the fact that she answered questions well at the hearing and the ALJ's suspicion that plaintiff may not have been taking special education classes in high school, all work to support the ALJ's conclusion that plaintiff has the capacity and ability indicative of Borderline Intellectual Functioning rather than mild mental retardation. (T. 14).

---

[5]The familiar five steps are as follows: (1) If the claimant is performing substantial gainful work, she is not disabled; (2) If the claimant is not performing substantial gainful work, her impairment(s) must be "severe" before she can be found to be disabled; (3) If the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry; (4) If the claimant's impairment (or impairments) does not prevent her from doing her past relevant work, she is not disabled; (5) Even if the claimant's impairment or impairments prevent her from performing her past work, if other work that accommodates her residual functional capacity and vocational factors exists in significant numbers in the national and local economies, she is not disabled.

Next, the ALJ commented on plaintiff's allegation of a severe mood disorder, observing that plaintiff had not sought treatment and was not taking any prescribed medications until after filing her claim for SSI benefits when she self-referred to Mercy Behavioral Health. (T. 14). The ALJ further noted that plaintiff was diagnosed with a conduct disorder of childhood onset, but that diagnosis was reached primarily on plaintiff's self-report, and therefore the ALJ concluded that accepting this diagnosis is "not reasonable." (T. 14).

The ALJ did find that plaintiff is severely impaired by Borderline Intellectual Functioning and a depressive disorder, but that the severity of the impairments is not such that would preclude her from daily work. (T. 15).

The ALJ also considered plaintiff's subjective complaints, evaluating both the medical and non-medical evidence, among other factors, and determined that plaintiff failed to show the severity of symptoms necessary to support a finding that plaintiff is unable to engage in gainful employment. (T. 16). The ALJ considered such things as plaintiff's caring for her child, her failure to pursue mental health treatment, the dosage of Effexor that plaintiff was prescribed (which was unacceptably low to the ALJ), and the fact that, as the ALJ phrased it, "[s]he did not seem retarded at the hearing." (T. 16). The ALJ concluded that nothing exists in the non-medical record that would prevent plaintiff from working within her residual functional capacity. (T. 16).

The ALJ also stated that he accepted the testimony of the VE and agreed with her identification of jobs available in the national economy as being appropriate to plaintiff's occupational potential, therefore finding the claimant not to be disabled. (T. 17). The ALJ rejected the additional hypotheticals proffered by plaintiff's counsel as unsupported by the record. (T. 17).

The decision of the ALJ concluded that plaintiff is not eligible for supplemental security income under the Social Security Act based on the April 25, 2003 application. (T. 18).

### D. Standard of Review

Under the Act, disability is defined in terms of the effect an impairment has on an individual's ability to function in the workplace. 42 U.S.C. § 423 (d)(1)(A), (2)(A). See Heckler v. Campbell, 461 U.S. 458, 460 (1983). Specifically, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). See Barnhart v. Walton, 535 U.S. 212 (2002). Thus, to establish that he or she is entitled to SSI benefits, the plaintiff has the burden of showing that he or she has a medically determinable impairment that is so severe that it prevents him or her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423 (d)(1)(A). See Hecker v. Campbell, 461 U.S. at 460.

In reviewing the administrative determination by the Commissioner regarding a plaintiff's disability, the question before the court is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987). Substantial evidence is defined as less than a preponderance and more than a mere scintilla. Richardson, 402 U.S. at 402. If supported by substantial evidence, the Commissioner's decision must be affirmed. Hartranft v. Apfel, 181

F.3d 358, 360 (3d Cir. 1999).

The five-step process of 20 C.F.R. §§ 404.1520(a) and 416.920(a), discussed *supra*, is used to determine disability eligibility. Here the ALJ determined that plaintiff was not disabled at the fifth step, finding that although plaintiff suffered from severe impairments, the Commissioner had nevertheless met his burden of proving that, considering plaintiff's age, education, past work experience and residual functional capacity, she could perform work that exists in significant numbers in the regional or national economy. 42 U.S.C. § 416.960(c). See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

### E.     Discussion

Plaintiff initially argues that the ALJ erred in finding that plaintiff's mental impairment did not meet or equal the requirements of § 12.05(C) of the listed impairments regarding mental retardation.

Listing 12.05 provides, in pertinent part:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> *   *   *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C). Thus, as found by the Court of Appeals for the

Third Circuit, to meet the requirements of § 12.05(C), "a claimant must i) have a valid verbal, performance or full scale IQ of 60 through 70, ii) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was initially manifested during the developmental period (before age 22)." Markle v, Barnhart, 324 F.3d 182, 187 (3d Cir. 2003).

Plaintiff argues that because the record contains two valid IQ scores of 70 or lower, she meets the listing for mental retardation and, thus, the ALJ erred in finding that plaintiff was not disabled at the third step of the sequential evaluation process.[6] In particular, plaintiff faults the ALJ for rejecting her claim based on the absence in the record of a formal diagnosis of mental retardation which, plaintiff argues, is not required.

Although it appears that a formal diagnosis of mental retardation is not required in order to meet the first prong of § 12.05(C), it does not appear that the ALJ in this case imposed such a requirement in rejecting plaintiff's claim. Although, to be sure, the ALJ took note of the fact that mental retardation had not been diagnosed, he did so merely to point out that, given plaintiff's two qualifying IQ scores, the examiners could have diagnosed plaintiff with mental retardation but, instead, diagnosed her only with Borderline Intellectual Functioning. Noting that a diagnosis of Borderline Intellectual Functioning is appropriate where the IQ is in the 71-84 range, the ALJ stated that the diagnoses within that category indicated that the examiners "did not believe the claimant had a true IQ below 71." (T. 13-14). Thus, it appears clear that the absence of a diagnosis of mental retardation was noted simply as evidence to support the ALJ's conclusion

---

[6] As previously discussed, plaintiff received a Verbal IQ score of 68 when given the WAIS-III by Dr. Mrus in June of 2001, and a score of 69 when tested by Dr. Leon Kalson in June of 2003. (T. 123, 149).

15

that the alleged qualifying scores were not valid scores, and not because plaintiff had failed to meet some requirement.

Moreover, although the plaintiff takes exception to the ALJ's reference to the DSM-IV, as setting forth the appropriate IQ ranges for diagnosing mental retardation as opposed to Borderline Intellectual Functioning, arguing that "it is not at all clear that the DSM was the Examiner's frame of reference," review of the record shows that both examiners reference the DSM-IV in reporting their diagnostic impressions. (T. 124, 149, 150). Because the examiners clearly used the criteria set forth in the DSM-IV to render their diagnoses of plaintiff as Borderline Intellectual Functioning, it appears wholly appropriate for the ALJ to point out that under the DSM-IV, Borderline Intellectual Functioning applies where the IQ is in the 71-84 range, and not in the 70 or below range.[7]

Finally, plaintiff argues that because there is no serious dispute that the record contains two valid IQ test results that meet the first prong of listing 12.05(C), the ALJ's reasons for finding that the two qualifying IQ scores invalid are unpersuasive. Specifically, plaintiff not only reiterates her argument that the ALJ erred in dismissing her qualifying scores because she was

---

[7] We note here that defendant devotes much of its brief arguing that because plaintiff fails to meet the "capsule definition" of mental retardation in the first instance, whether or not she had a valid IQ score meeting the requirements of 12.05(C) is irrelevant. Specifically, defendant argues that because there is not only no diagnosis of mental retardation but no other evidence that would support such a claim, the ALJ properly rejected her assertion that she met listing 12.05(C) because she was not mentally retarded and, thus, failed to meet the threshold requirement. Although defendant's argument is not without some validity given the diagnoses of Borderline Intellectual Functioning, it nevertheless appears to overlook the fact that there are two qualifying scores of record which would seemingly satisfy the criteria in subsection C and, thus, the definition of mental retardation under 12.05. Moreover, although the ALJ ultimately determined that plaintiff was not mentally retarded, he did so having considered plaintiff's two qualifying scores. The fact that he found them invalid, which then allowed the ALJ to revisit whether plaintiff met the capsule definition in the first instance, does not, in my view, render them irrelevant but merely insufficient. This, having been said, the end result -- that plaintiff does not meet the requirements of 12.05 -- is the same whether it is because her qualifying scores were invalid or because she did not meet the capsule definition in the first instance.

not specifically diagnosed with mental retardation but also contends that the ALJ misconstrued Dr. Mrus' report wherein he stated that plaintiff's performance was "likely being influenced somewhat by her physical discomfort" and that the results are considered only "reasonably accurate," and that the ALJ erred by discrediting the scores obtained by Dr. Kalson having relied only on his "glancing reference to plaintiff's activities of daily living."

As previously discussed, plaintiff's argument that the ALJ somehow imposed the requirement that a claimant must be formally diagnosed with mental retardation in order to meet the listings is not supported by the record. Indeed, as even plaintiff allows, the ALJ was merely emphasizing that plaintiff has been diagnosed with Borderline Intellectual Functioning, which is a different diagnosis than mental retardation, and not that a formal diagnosis of mental retardation was required.

Further, although plaintiff argues that the ALJ misconstrued Dr. Mrus' report, review of the record is to the contrary. Noting that plaintiff was suffering from "a rather severe cold," Dr. Mrus evaluated plaintiff's WAI-III test stating that, "[t]he results are considered reasonably accurate reflectors of her intellectual status, these likely being influenced somewhat by her physical discomfort." (T. 149). Dr. Mrus then concluded that, "[u]sing the DSM-IV system, the Full Scale IQ suggests Borderline Intellectual Functioning." (T. 149).

In his decision, the ALJ recounted precisely what Dr. Mrus reported. Although, as pointed out by plaintiff, Dr. Mrus did not indicate that plaintiff's test scores were invalid, that does not negate the fact that he qualified the results stating that they were only reasonably accurate and likely influenced by her physical discomfort. These observations, coupled with his finding that plaintiff had only Borderline Intellectual Functioning which, according to the DSM-

17

IV, is appropriate where IQ scores are in the 71-84 range, demonstrate that the ALJ's conclusion that plaintiff's Verbal IQ score of 68 was invalid appears to be supported by substantial evidence.

Similarly, although Dr. Kalson did state in his report that, "[t]est findings on WAIS-III are valid and reliable measure of [plaintiff's] characteristic pattern and level of intellectual functioning," he also diagnosed plaintiff as having only Borderline Intellectual Functioning which, as previously discussed, is inconsistent with plaintiff's qualifying IQ score. (T. 123, 124). Moreover, as noted by the ALJ, Dr. Kalson also found that plaintiff "has the capability to follow simple instructions and carry out routine tasks." (T. 124). The ALJ then went on to state that this evidence taken together with "the claimant's activities of daily living, including caring for a young child," and the fact that she responded well to questions at the hearing without undue delay or confusion, persuaded him that he could not view plaintiff's numeric indicators of IQ in a vacuum. (T. 14, 16). Under these circumstances, it cannot be said that the ALJ's findings are not supported by substantial evidence.

In this manner, plaintiff's reliance on Markle v. Barnhart, 324 F.3d 182, is misplaced. Although the Markle Court did find that the type of daily activities that plaintiff engages in are not factually inconsistent with qualifying IQ scores, there was no evidence that Markle, like the instant plaintiff, had been diagnosed with Borderline Intellectual Functioning which *is* factually inconsistent with qualifying IQ scores. Moreover, the Court in Markle, rejected the ALJ's findings that the qualifying scores were invalid because the doctor who reported the scores stated that the scores were valid and did not otherwise qualify them or find that they were inconsistent with the various positive aspects he noted in Markle's appearance or demeanor, and because there was no expert opinion of a psychologist or medical person to contradict the doctor's

findings with respect to Markle's IQ. Id. at 187.

Here, Dr. Kalson not only found that plaintiff had the capability to follow simple instructions and carry out routine tasks, (T. 124), but Dr. Dalton, a state agency psychologist, reviewed plaintiff's records and found that, although a medically determinable impairment was present, there was no valid verbal, performance or full scale IQ of 60 through 70 that would satisfy the criteria for mental retardation. (T.134). Thus, unlike in Markle, there is evidence of record in this case which contradicts plaintiff's qualifying scores and provides the basis for finding that the ALJ's decision is supported by substantial evidence. Indeed, even the Markle Court found that IQ scores that are contradicted by other evidence of record are properly rejected. Id. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (It is well established that an ALJ may rely on the opinions of non-examining physicians if the opinions are consistent with the record). See also 20 C.F.R. § 404.1527(f) (Although state agency physicians are non-examining physicians, they "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.")

### III. CONCLUSION

For the reasons set forth above, the Court recommends that the Motion for Summary Judgment filed by Elder (Doc. 8) be denied. It is further recommended that the Motion for Summary Judgment filed by the Commissioner (Doc. 10) be granted and the decision of the Commissioner be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance

with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

*/ s/ Amy Reynolds Hay*
United States Magistrate Judge

Dated: 10 March, 2008

cc: Hon. Joy Flowers Conti
     United States District Judge

     All counsel of record by Notice of Electronic Filing